UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,            **REPORT AND RECOMMENDATION**

v.

JAMES ARTHUR MOREY,            19-CR-00191-RJA-JJM

           Defendant.
_____

       Defendant James Arthur Morey is charged in an Indictment [7] [1] with one count of possessing images of child pornography, in violation of 18 U.S.C. §§2252A(a)(5)(B) and 2252A(b)(2). This charge arises from a May 8, 2019 search of his residence at 633 South Union Street, Apartment 1, in Olean, New York, conducted while defendant was on supervised release.

       Before the court is defendant's motion to suppress all evidence arising from that search (Passafiume Affirmation [19], ¶¶9-10), which has been referred to me by District Judge Richard J. Arcara for initial consideration [8]. An evidentiary hearing was conducted on September 30, 2020, at which Edward O'Dell and United States Probation Officer Gavin Lorenz testified [43]. Having reviewed the parties' submissions [19, 26, 29-30, 46-49] and heard oral argument on January 22, 2021 [51], for the following reasons I recommend that the motion be denied.[2]

---

[1]      Bracketed references are to CM/ECF docket entries, and page references are to CM/ECF pagination (upper right corner of the page).

[2]      Although defendant's pretrial motion [19] sought other relief, defendant's counsel acknowledged at oral argument that suppression was the only issue remaining in dispute.

## FACTS

On March 1, 2010, defendant was convicted of possession of child pornography and sentenced by Judge Arcara to 132 months incarceration followed by a lifetime period of supervised release. September 30, 2020 hearing transcript [43], p. 3; gov. ex. 1 [41-1]. Before his March 21, 2018 release from prison, Officer Lorenz reviewed the conditions of supervised release imposed by Judge Arcara with defendant, and he signed an acknowledgment that he understood those conditions. [43], pp. 35-37; gov. ex. 1 [41-1], p. 5; defendant's Post-Hearing Memorandum [46], p. 2. The relevant conditions of defendant's supervised release required him to:

-- "permit a probation officer to visit him . . . at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer" (gov. ex. 1 [41-1], p. 3 (Standard Conditions, ¶10));

-- "provide the U.S. Probation Office advance notification of any computer(s) . . . that he will use during the term of supervision. Such computer . . . will be subject to monitoring by the U.S. Probation Office" (id., p. 4 (Special Conditions)); and

-- "submit his person, and any property, house, residence, . . . computer, other electronic communications or data storage devices or media, and effects to search at any time, with or without a warrant, by any . . . probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the person". Id.

On both April 16 and April 26, 2019, Officer Lorenz attempted to contact defendant at his residence and by telephone, but was unsuccessful. [43], pp. 39, 41; gov ex. 5 [41-5], p. 2. This prompted a third visit to defendant's residence on May 8, 2019. [43], p. 42. On

this visit, Officer Lorenz was accompanied by United States Probation Officer Ann Marie Buckholtz, his field partner, and Andrew Kerrissey, a Probation Officer Assistant, who was training. Id., p. 44  Upon their arrival at approximately 10:30 to 10:45 a.m., Officer Lorenz knocked on defendant's door for a couple of minutes without a response.  Id., pp. 44-45.  He then telephoned defendant and left a voicemail directing him to return the call.  Id.

While still outside of defendant's residence, Mr. O'Dell, the landlord, approached the officers. Id., p. 46. Although Mr. O'Dell had never met Officer Lorenz in person, he had spoken to him about another tenant a couple of years before.  Id., pp. 18.  Mr. O'Dell owned 130 apartments across at least two states, but was at 633 South Union Street that day performing work on the property, which consisted of seven apartments. Id., pp. 6, 19. Defendant stayed in an apartment rented by Vern Altman. Id., pp. 8, 26.

Officer Lorenz asked Mr. O'Dell if had seen defendant "in the last month or two", explaining that he had not able to make contact with him and "was starting to get concerned". Id., p. 46.  Mr. O'Dell also had not seen defendant and became concerned about Mr. Altman's dog, since he was aware that Mr. Altman was hospitalized as a result of stroke, and decided to perform a wellness check.  Id., pp. 9-11, 46-47.  As a landlord, Mr. O'Dell had the ability to conduct wellness checks on his tenants, and had performed them "numerous times before that". Id., p. 12.  According to Mr. O'Dell, the United States Probation Officers present played no role in his decision to conduct the wellness check. Id., pp. 12, 28-29.  Likewise, Officer Lorenz denied that he suggested the wellness check to Mr. O'Dell.  Id., p. 47.

Mr. O'Dell testified that his wife unlocked the door to defendant's residence, and that he knocked on the door yelling "landlord". Id., pp. 11, 13, 23, 48.[3]  When no one answered,

---

[3]  By contrast, Officer Lorenz did not mention the presence of Ms. O'Dell and believed that Mr. O'Dell had unlocked the door. [43], p. 48.

-3-

Mr. O'Dell opened the door, observed defendant coming out of the bathroom, which was directly in front of the entrance, and then backed out of the apartment and walked away with his wife. Id., pp. 11, 13-15. Mr. O'Dell did not recall whether he observed the dog, explaining that when he observed defendant, he "didn't have to worry about the dog anymore because there was somebody there". Id., p. 24.

Officer Lorenz testified that he was standing a foot or two behind Mr. O'Dell[4] looking over his shoulder as he opened the door and observed defendant looking back at them. Id., pp. 49-50. Officer Lorenz asked defendant why he had failed to the open the door, but he did not respond. Id., p. 50. At that point, Officer Lorenz entered the residence and began his "standard home contact routine". Id., pp. 50-51. When he looked to his left, Officer Lorenz observed a tablet computer sitting on the couch, which he had no advance notice of, and defendant confirmed that it belonged to him. Id., pp. 52-54.

Given defendant's admission, Officer Lorenz asked one of colleagues to "keep an eye on" him, and he exited the residence to call his supervisor to obtain permission to conduct a search, believing that reasonable suspicion existed that defendant had violated the conditions of his supervised release. Id., pp. 54-55. After informing his supervisor, John Taberski, that he observed the tablet computer in plain view and that defendant admitted that it belonged to him, he received permission for the search. Id., pp. 54-56.

Before commencing the search, Officer Lorenz handcuffed defendant for safety reasons, because he appeared "a little agitated and surprised". Id., p. 57. Defendant remained seated while Officers Buckholtz and Lorenz searched the premises. Id., pp. 57-58. During the search, a rental purchase agreement and receipt for the tablet computer dated May 7, 2019 were

---

[4]   According to Mr. O'Dell, the probation officers were "maybe 5, 10 feet" behind. [43], p. 14.

discovered. Id., pp. 58-61; gov. exs. 3 [41-3] and 4 [41-4]. Two cellphones were also discovered and seized - one that was "in plain view, not even hidden", and the other was broken. [43], p. 58. Following the seizure of these items, defendant was asked what they were going to find on the tablet computer, and he admitted that he had used it to search for child pornography. Id., pp. 62-63. He also made other statements while handcuffed.[5]

At the conclusion of the approximately 35-minute search,[6] the officers placed the seized evidence in their vehicle, and defendant was uncuffed and told by Officer Lorenz that he would be in contact. Id., p. 64. Although it was not provided to defendant, Officer Lorenz prepared a property receipt for the three electronic devices that were seized. Id., pp. 63-64; gov. ex. 7 [41-7]. On the property receipt Officer Lorenz checked the box indicating the items were seized as a result of a search, rather than the box indicating that items were seized in plain view, because the tablet computer, while observed in plain view, was seized as a result of the subsequent search. [43], pp. 79, 83; gov. ex. 7 [41-7]. According to Officer Lorenz, he could have seized the tablet computer in plain view, but elected not to do so until he received authority for a search. [43], p. 80. Officer Lorenz did not complete the section of the form for identifying the location where the seized items were discovered. Id., p. 79.

---

[5] Since defendant remained handcuffed and had not been read his Miranda rights at the time that he made these statements, the government agrees not to use them in its case-in-chief. Government's Post-Hearing Memorandum [47], p. 5 n. 3.

[6] Notwithstanding Officer Lorenz's testimony that he arrived at residence at approximately 10:30 - 10:45 a.m. ([43], p. 44) and that the search lasted approximately 35 minutes (id., p. 63), his chronological entries for that day stated that at 11:15 a.m. defendant was observed "walking down the street with a bag *approximately 30 minutes after exigent search was conducted*", which casts doubt on those timeframes. Gov. ex. 5 [41-5], p. 1 (emphasis added); [43], pp. 74-75.

On May 13, 2019, Officer Lorenz also prepared an Exigent Search Report (gov. ex. 6 [41-6]) from memory detailing the May 8, 2019 search. [43], p. 76. Contrary to his testimony, that report states that "[u]pon entering the residence, USPO did observe *2* internet capable devices in plain view. [Defendant] admitted to being the owner of both devices". Gov. ex. 6 [41-6], p. 2 (emphasis added).

## DISCUSSION

**A.     Motion to Suppress Evidence**

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). "One of the exceptions to the warrant requirement involves searches involving those on supervised release." United States v. Jaiman, 2018 WL 1870483, *6 (S.D.N.Y. 2018).

As defendant recognizes, "law enforcement may search a supervisee's home without a warrant where the search is authorized as a condition of supervised release *and* is based on reasonable suspicion". Defendant's Post-Hearing Memorandum [46], p. 5 (emphasis in original) (*citing* United States v. Knights, 534 U.S. 112, 120 (2001)). According to the government, Officer Lorenz's "observation of an unapproved electronic device in the possession of a convicted offender whose whereabouts were unknown for the past three weeks" provided reasonable suspicion for the search. Government's Post-Hearing Response [49], p. 7.

**A. Officer Lorenz Lawfully Entered Defendant's Residence**

Defendant argues that there was "no legal authority for Mr. O'Dell to open [his] door for Officer Lorenz", and since "Officer Lorenz did not lawfully observe the tablet in plain view, the government cannot rely on this fact to support reasonable suspicion". Defendant's Post-Hearing Memorandum [46], pp. 9, 14.

"[A]lthough the Fourth Amendment does not protect against searches or seizures 'effected by a private party on [her] own initiative,' it does apply when a private party commits the intrusion while acting 'as an instrument or agent of the Government.'" United States v. Cacace, 796 F.3d 176, 189 (2d Cir. 2015) (*quoting* Skinner v. Railway Labor Executives' Association, 489 U.S. 602, 614 (1989)). Defendant's contention that Mr. O'Dell was acting at the behest of Officer Lorenz in opening the door to defendant's residence stems from his challenge to the credibility of the government's witnesses. Specifically, he argues that "in order for Officer Lorenz to be lawfully in a position to view the tablet on the couch, this Court has to believe that the only reason Mr. O'Dell opened [his] door was a legitimate concern for a dog". Defendant's Post-Hearing Memorandum [46], p. 14.

"It is within the province of the district court as the trier of fact to decide whose testimony should be credited . . . . And as trier of fact, the judge is 'entitled, just as a jury would be . . . to believe some parts and disbelieve other parts of the testimony of any given witness.'" Krist v. Kolombos Rest. Inc., 688 F.3d 89, 95 (2d Cir. 2012). An adverse credibility determination is "appropriately based upon inconsistent statements, contradictory evidence, and inherently improbable testimony". Diallo v. I.N.S., 232 F.3d 279, 287 88 (2d Cir. 2000).

Although defendant points to a minor inconsistency between the testimony of Officer Lorenz and Mr. O'Dell concerning who unlocked defendant's door (defendant's Post-

Hearing Memorandum [46], pp. 13-14), their testimony was generally consistent, both internally and *vis-a-vis* each other. He also questions the plausibility of their testimony, asking "what ever happened to the mysterious cute little dog" that was the predicate for the wellness check of his residence. Defendant's Post-Hearing Memorandum [46], p. 14. Despite Mr. O'Dell's purported concern for the dog, I do not find it suspicious that he could not recall whether he observed the dog when he opened the door to defendant's residence. [43], p. 24. As he explained, his reason for performing the wellness check was to ensure that someone was in the residence to care for the dog, and when he observed defendant, that concern was allayed. Id.

Much of defendant's remaining credibility attack centers on Officer Lorenz's "candid disinterest in preparing and maintaining probation reports" and the absence of Mr. Dell's name from any document related to this incident. Defendant's Post-Hearing Memorandum [46], pp. 11-14. While I agree that their record keeping was not perfect, having personally observed the witnesses and considered their demeanor, I credit their testimony.

Based on that testimony, I conclude that Mr. O'Dell, a non-governmental actor, independently decided to open defendant's door as part of a wellness check.[7] As the government notes (and defendant does not dispute), upon observing defendant through the open door, Officer Lorenz was permitted to enter the residence pursuant to the condition of defendant's supervised release that required him "to permit a probation officer to visit him . . . at any time at home". Gov. ex. 1 [41-1], p. 3 (Standard Conditions, ¶10). *See* Government's Post-Hearing Response [49], p. 3.

---

[7] Although defendant correctly notes that Officer Lorenz may have overstated the duration since his last contact with defendant, which had been 22 days rather than a "month or two" earlier as he inferred to Mr. O'Dell, I do not find that this swayed, or was intended to sway, Mr. O'Dell into conducting the wellness check. *See* Defendant's Post-Hearing Memorandum [46], pp. 13-14.

### B. Once Lawfully in the Residence, Officer Lorenz's Observations and Statements made by Defendant Provided Reasonable Suspicion for the Search

Alternatively, defendant argues that even if Officer Lorenz "was lawfully in position to view the tablet on the couch, the tablet . . . did not have any incriminating character to justify its seizure" under the plain view doctrine. Defendant's Post-Hearing Memorandum [46], p. 14. However, as the government argues, and the undisputed evidence supports ([43], pp. 79. 83; gov. ex. 7 [41-7]), "Officer Lorenz did not seize the defendant's tablet based on the plain view exception to the Fourth Amendment", but rather seized it after he conducted "a search of the defendant's residence based on reasonable suspicion that the defendant had violated [the] condition of his supervised release" (government's Post-Hearing Response [49], p. 5), that required him to "provide the U.S. Probation Office advance notification of any computer(s) . . . that he will use during the term of supervision". Gov. ex. 1 [41-1], p. 4 (Special Conditions).

Significantly, defendant does not contend that Officer Lorenz's observation of the unauthorized tablet computer that defendant admitted belonged to him failed to provide reasonable suspicion for his search. Defendant's belief that Officer Lorenz should have "simply . . . directed [him] to have the monitoring software installed on the tablet", does not displace the existence of reasonable suspicion for the search. Defendant's Post-Hearing Memorandum [46], p. 15. For these reasons, I recommend that defendant's motion to suppress evidence from the May 8, 2019 search, including his statements,[8] be denied.

---

[8] Defendant seeks suppression of his statement solely as "fruit of the poisonous tree based on Officer Lorenz's Fourth Amendment violation of illegally entering and searching [his] home". Defendant's Reply Memorandum [48], p. 1.

**CONCLUSION**

For these reasons, I recommend that defendant' motion for suppression (Passafiume Affirmation [19], ¶¶9-10)) be denied. Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by March 5, 2021. Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(c)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(c)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

Dated: February 19, 2021

/s/Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge

-10-